# JEAN-PIERRE IBAR ET AL. *v.* STRATEK PLASTIC LIMITED ET AL.

## (AC 35011)

Lavine, Alvord and Schaller, Js.

Argued June 3—officially released September 3, 2013

*Jean Pierre Ibar*, self-represented, the appellant (named plaintiff).

*Timothy W. Donahue*, for the appellee (named defendant).

*Opinion*

PER CURIAM. In this breach of contract action, the plaintiff Jean-Pierre Ibar appeals from the judgment of the trial court directing a verdict in favor of the defendant Stratek Plastic Limited (Stratek).[1] On appeal, Ibar's principal claim is that the court erred in directing a verdict for Stratek and denying his motion to set aside the directed verdict. Ibar also claims that the trial judge

[1] Ibar filed this action as a self-represented party on his own behalf and on behalf of Eknet Research Corporation against Stratek and Stamford Polymer Research Laboratory, Inc. Because a valid appearance was never entered on behalf of Eknet Research Corporation, we refer to Ibar as the plaintiff. On September 15, 2009, the court, *Holden, J.*, dismissed the action as to Stamford Polymer Research Laboratory, Inc. Ibar thereafter withdrew the action as to that defendant. We, therefore, refer to Stratek as the defendant.

was not "independent and unbiased"[2] and, further, that he suffered prejudice due to the improper administrative handling of this case by judicial branch personnel.[3] We affirm the judgment of the trial court.

The record discloses the following relevant facts, which we construe in the light most favorable to Ibar.[4] See *Levesque* v. *Bridgeport Hospital, Inc.*, 286 Conn. 234, 253, 943 A.2d 430 (2008). On July 4, 1999, Ibar, a scientist and inventor, entered into a shareholder agreement with Jose Luis Turullols. Pursuant to this agreement, Ibar and Turullols, who represented himself and a group of investors, agreed to form a company to investigate, develop, and market Ibar's technology.[5] The

[2] Ibar framed this issue as follows: "Whether the Hon. Angela Robinson acted as an independent and unbiased judge in handling case CV-08-502-3192-S prior to and during the trial of the two consolidated cases CV-07-5010242 and CV-5023192-S?"

[3] Stratek contends that we should not consider any of the issues raised on appeal because Ibar failed to comply with the rules of appellate procedure. Specifically, Stratek contends that Ibar improperly incorporated the arguments from his trial court briefs within his brief to this court. Stratek also argues that Ibar failed to comply with the requirements of Practice Book § 67-4 (d) (3), which provides the procedure for briefing claims of evidentiary error. Finally, Stratek contends that Ibar's brief contains unsubstantiated allegations and characterizations of the trial court proceedings. We initially note that Ibar's request for permission to file an oversized brief was granted by this court. Further, we have reviewed Ibar's brief and have discerned what we believe are the principal claims on appeal. We will, therefore, proceed to review the claims on the merits. See *Kopylec* v. *North Branford*, 130 Conn. App. 146, 148 n.1, 23 A.3d 51, cert. granted on other grounds, 302 Conn. 930, 28 A.3d 346 (2011) (appeal withdrawn March 14, 2012).

[4] In 2008, the parties participated in an arbitration proceeding involving the same underlying facts. The court in this matter ordered that certain findings of fact that had been included in the decision of the arbitration panel would be submitted to the jury as undisputed facts.

[5] The agreement provided, in part, as follows:

"Representations:

"Mr. Ibar is the sole owner of all proprietary rights embodied in U.S. Patent no 5,885,495, patent application no EL 051860613 US, and others related to the invention presently known as 'EZ-Flow processing' or 'methods and apparatus to control viscosity of molten plastics.' These rights include, but are not limited to, copyrights, trade secrets, formulas, research data, knowhow and specifications.

parties thereafter formed a corporation called Plastitech Ltd. (Plastitech) for this purpose in August of 1999 on the Isle of Man. By 2002, however, Plastitech needed additional funding. An investment firm located in Spain called Torreal S.A. (Torreal) agreed to invest $5.5 million but would not invest in Plastitech because it was an off-shore company. Stratek was therefore formed in April of 2002 in Dublin, Ireland.[6] According to the articles of association, Stratek was a private company limited to fifty members. The board of directors of Stratek was responsible for managing the company.

At the same time that Stratek was formed, several other contracts were signed. Torreal, Stratek, and the

---

"Mr. Jose Luis Turullols represents himself and a group of investors ('The founders') which jointly contribute US $600,000 (six hundred thousand).

"The agreement:

"1. The parties agree to incorporate a company, to investigate, develop and market the above methods, to which Mr. Ibar transfers all of the aforementioned rights and Mr. Turullols the US $600,000.

"2. Once the company is in operations, Mr. Ibar will have the right to 15% of the gross revenues arising from royalties' income calculated at the source, and to 3% of the gross revenues arising from the sale of goods and services also calculated at the source.

"3. The stock will be distributed as follows:

| | |
|---|---|
| Dr. Ibar | 45% |
| Promoter, Mr. Turullols | 5% |
| Founders | 50% |
| Total | 100% |

"4. In the event that new issues of capital stock are voted, the company will reserve for Mr. Ibar the sufficient number of shares so Mr. Ibar will be able to maintain 51% of the capital stock. This stock will be purchased by Mr. Ibar with proceeds from dividends distribution.

\* \* \*

"By the date specified below, Mr. Turullols agrees to grant Mr. Ibar the voting power of sufficient number of shares in the company formed to investigate, develop and subsequently market, the invention known as 'EZ-Flow processing' or 'methods and apparatus to control viscosity of molten plastics', so Mr. Ibar can maintain 51% of the said voting power."

[6] The trial court noted that there were two companies formed by Ibar and others using the name "Stratek," but for purposes of its decision, reference to "Stratek" meant the defendant. The other company was called "Stratek of London." For purposes of this opinion, references to "Stratek" also refer to the defendant.

individual and corporate shareholders of Stratek, including Turullols and Plastitech, entered into an agreement dated April 18, 2002. Pursuant to this agreement, following Torreal's investment, Torreal owned a 10 percent interest in Stratek and Plastitech owned a 40.5 percent interest in Stratek. Also on April 18, 2002, Ibar and Stratek signed a services agreement pursuant to which Ibar became the director of technology for Stratek. Finally, on the same date, Ibar assigned his interest in various patents to Stratek, pursuant to a written patent assignment agreement.

Following the formation of Stratek, the operation moved to Wallingford. By 2006, Stratek was having financial difficulties. On July 7, 2006, Alan Stall was appointed chief executive officer of Stratek. On November 16, 2006, Stratek terminated Ibar's position as director of the company. Ibar then commenced the present action, which was consolidated and tried to a jury with *Stratek Plastic Ltd.* v. *Ibar*, 145 Conn. App. 414, 74 A.3d 577 (2013), a fraudulent conveyance action that we also decide today.

In the present action, Ibar's amended one count complaint alleged that "[he] seeks compensation and punitive damages, attorney's fees, costs . . . and such other relief as the court may deem appropriate [for] . . . Stratek's defrauding of Ibar's ownership in Stratek pursuant to the initial agreements of July 4, 1999. Ibar is contracted to have [40.5] percent of the shares of a corporation that owns and commercializes Ibar's inventions. Stratek owns and commercializes Ibar's inventions, yet Ibar owns zero of Stratek or of any company owning stock in Stratek."[7] At the conclusion of Ibar's

[7] On September 15, 2009, the trial court, *Holden, J.*, dismissed all but one paragraph of Ibar's complaint on the ground that those allegations arose out of the same facts alleged in a prior action brought by Ibar against Stratek, which had been resolved in arbitration. The remaining paragraph alleged breach of the July 4, 1999 shareholder agreement. On March 7, 2012, prior to Ibar resting his case, the court allowed Ibar to amend his complaint to change the percentage from 45 percent as originally alleged, to 40.5 percent.

evidence, Stratek moved for a directed verdict, essentially arguing that Ibar had not produced evidence of a contractual agreement between the parties regarding Ibar's ownership of shares in Stratek. Following oral argument, the court issued a written opinion granting Stratek's motion for a directed verdict due to Ibar's failure to present a prima facie case of breach of contract. Specifically, the court found that the evidence introduced in Ibar's case did not establish that there was an express contract between the parties that Ibar would receive 40.5 percent of the shares of Stratek in his name. The court also held that Ibar's claim was time barred. The court subsequently denied Ibar's motion to set aside the verdict, and Ibar filed the present appeal.[8]

I

Before addressing the merits of Ibar's principal claim on appeal, we consider his claim that Judge Robinson was not an independent and unbiased trial judge.

The following facts are necessary for the resolution of this claim. On September 27, 2010, Judge Robinson denied Ibar's application for a prejudgment remedy in this matter. In her decision denying the motion for prejudgment remedy, the court stated in part: "Notwithstanding Ibar's assertion that the issue of standing has been previously decided, this court finds that no trial court has decided this issue of standing before. But, even if it had been previously raised, the law of the case doctrine would not preclude the trial court from

[8] On appeal, Ibar contends that the court did not give his arguments full consideration. The record reflects, however, that the court heard argument on Stratek's motion for directed verdict on Friday, March 9, Monday, March 12, and Tuesday, March 13, 2012. In addition, the court heard oral argument on Ibar's motion to set aside the verdict and considered the briefs filed by the parties on this issue. Contrary to Ibar's claim, the court repeatedly provided him with the opportunity to defend against Stratek's motion for a directed verdict and to argue his position with regard to the motion to set aside the verdict.

revisiting this issue. . . . The plaintiff will likely be found to lack standing to assert claims on behalf of Plastitech. Therefore the prejudgment remedy should be denied." (Citation omitted.)

Stratek subsequently filed a motion to dismiss, arguing that Ibar lacked standing to assert the claims alleged. In denying this motion to dismiss, the court, *Burke, J.,* noted that "prior to Judge Robinson's decision, and unbeknown to her due to an error in the case docket, the issue of standing had been decided. Judge Alander, in deciding [Stratek's] second motion to dismiss for lack of standing, held that [Ibar] is not 'asserting a right on behalf of a corporation. He's asserting his own right to [45] percent of the stock in the corporation that is commercializing his invention. . . . [H]e's claiming . . . he, personally, had this agreement and it was breached. That's . . . how I read paragraph 13 [of the complaint].' "[9] Judge Burke therefore denied Stratek's motion to dismiss.

On February 6, 2012, Ibar filed a motion to disqualify Judge Robinson, asserting, inter alia, that he believed she had "preconceived notions about this case, which will affect her judgments as the gatekeeper of the evidence and this will prejudice [him]." The court held a hearing and subsequently denied the motion, stating: "I do not hear a basis which would be appropriate for me to recuse myself or to disqualify myself on this particular file."[10] On appeal, Ibar challenges the court's

---

[9] On November 8, 2010, the court, *Silbert, J.,* granted Ibar's motion to correct the record to reflect that Judge Alander had denied Stratek's motion to dismiss on November 30, 2009.

[10] In denying the motion, Judge Robinson stated: "Judge Alander's ruling is the law of the case, and that is that Mr. Ibar has an opportunity to present his direct claim to the jury. That was certainly something that I did not know when I did the prejudgment remedy hearing and, so, I came out a different way on the standing issue, but I didn't decide the standing issue, I just said it was likely to come out a different way in my view. But Judge Alander's ruling is absolutely the law of the case and that is the case that's going to the jury."

decision denying his motion to recuse and further argues that the court exhibited questionable behavior toward him during the course of the trial.

"The inquiry into whether a motion for disqualification properly was ruled upon is governed by the abuse of discretion standard of review. . . . In applying that standard, we ask whether an objective observer reasonably would doubt the judge's impartiality given the circumstances. . . . If an objective observer, in view of all the facts would reasonably doubt the court's impartiality, the court's discretion would be abused if a motion to recuse were not granted. In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) *McKenna* v. *Delente*, 123 Conn. App. 137, 143–44, 1 A.3d 260 (2010).

Ibar offered no evidence to support his contention that Judge Robinson had "preconceived notions about this case." Although Judge Robinson previously had denied Ibar's application for a prejudgment remedy, "the fact that a trial court rules adversely to a litigant, even if some of these rulings were determined on appeal to have been erroneous, [still] does not demonstrate personal bias." (Internal quotation marks omitted.) *Burns* v. *Quinnipiac University*, 120 Conn. App. 311, 317, 991 A.2d 666, cert. denied, 297 Conn. 906, 995 A.2d 634 (2010). With regard to the issue of standing, Judge Robinson explained that she was unaware of Judge Alander's prior decision when she stated that Ibar likely would be found to lack standing to assert claims on behalf of Plastitech. That being said, she also acknowledged that Judge Alander's decision was the law of the case and that Ibar would have the opportunity to present his direct claim to the jury. In the absence of any

evidence requiring the recusal of Judge Robinson in this matter, Judge Robinson was required to hear and decide this case. See Rule 2.7 of the Code of Judicial Conduct ("[a] judge shall hear and decide matters assigned to the judge, except when disqualification is required by Rule 2.11 or other law"). We, therefore, reject the contention that the court abused its discretion in denying the motion to recuse in this matter.[11]

## II

We next briefly address Ibar's claim that he suffered prejudice due to the improper administrative handling of this case by the judges of the Superior Court as well as judicial branch personnel.

Ibar contends that, despite his efforts to correct the record, the errors in the electronic docket rendered it "confusing and unusable." He argues that he was harmed by the errors and the lack of action by the judges and court clerks to correct the errors. He also takes issue with the assignment of the prejudgment remedy hearing to Judge Robinson, and questions certain rulings made by the court at that proceeding.

We note that this is a large case file with close to two hundred docket entries. It is difficult to discern exactly how Ibar claims he was prejudiced by its handling. On the basis of our review of this file, however, we cannot conclude that Ibar was prejudiced by the manner in which this case was handled. During the trial in this matter, Ibar was given every opportunity to present evidence establishing that he had a contract with Stratek. That Ibar was unable to do so was not

---

[11] As part of the argument that Judge Robinson did not act as an independent and unbiased trial judge, Ibar claims that Judge Silbert, who selected Judge Robinson to preside at this trial, "control[led] the strategy and the proceedings without appearing on the front line." He also argues that Judge Robinson's interactions with his attorney indicated bias on her part. We simply note that none of these extravagant claims is supported in the record.

the fault of the judges and court clerks who were responsible for the administrative handling of this case.

### III

We now address Ibar's claims that the court erred in directing a verdict for Stratek and denying his motion to set aside the verdict.[12]

"We begin our analysis with the standard of review of a trial court's decision to grant a motion for a directed verdict. Whether the evidence presented by the plaintiff was sufficient to withstand a motion for a directed verdict is a question of law, over which our review is plenary. . . . Directed verdicts are not favored. . . . A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's decision to direct a verdict in favor of a defendant we must consider the evidence in the light most favorable to the plaintiff. . . . Although it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation. . . . A directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party." (Citation omitted; internal quotation marks omitted.) *Curran* v. *Kroll*, 303 Conn. 845, 855–56, 37 A.3d 700 (2012).

We set forth the following legal principles that are relevant to Ibar's claim of breach of contract. "The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages."

---

[12] As part of this argument, Ibar challenges the decision of the trial court to bifurcate the issues at trial. On the basis of our review of the record, we conclude that the court did not abuse its discretion in bifurcating the issues at trial following lengthy and complicated pretrial proceedings. See *Saczynski* v. *Saczynski*, 109 Conn. App. 426, 428–29, 951 A.2d 670 (2008).

(Internal quotation marks omitted.) *Keller* v. *Beckenstein*, 117 Conn. App. 550, 558, 979 A.2d 1055, cert. denied, 294 Conn. 913, 983 A.2d 274 (2009). "[I]n order to form a binding and enforceable contract, there must be an offer and an acceptance based on mutual understanding by the parties. . . . The mutual understanding must manifest itself by a mutual assent between the parties." (Internal quotation marks omitted.) *Housing Authority* v. *DeRoche*, 112 Conn. App. 355, 370, 962 A.2d 904 (2009).

In the present case, Ibar argued that he was entitled to 40.5 percent of the shares in Stratek. During oral argument on Stratek's motion for a directed verdict, the court repeatedly asked Ibar to point to the evidence proving that the parties had an agreement concerning Ibar's ownership of stock in Stratek. Ibar initially argued that it was one of the agreements that was executed in 2002 when Stratek was created.[13] Ibar later appeared to rely on the 1999 shareholder agreement between Ibar and Turullols.[14] In his memorandum of law in support of the motion to set aside the verdict, Ibar indicated that his argument was not that the 1999 agreement applied to Stratek, but rather, that Stratek agreed to

[13] The transcript reveals the following:

"The court: So you're saying it was a hybrid contract and you're saying it was entered into when? When was the contract entered into?

"[Counsel for Ibar]: 2002.

"The court: When in 2002; before the formation of Stratek, after the formation of Stratek?

"[Counsel for Ibar]: April 18th when the—Stratek was formed.

"The court: So you're saying this was one of the agreements that was executed when the company was formed?

"[Counsel for Ibar]: Yes, your Honor."

[14] The transcript reveals the following:

"[Counsel for Ibar]: I think that the jury should be able to decide whether or not when the—um—Stratek incorporated the—the company itself and they made Mr. Ibar a shareholder through Plastitech whether that was a breach of the contract.

"The court: What contract are we talking about now?

"[Counsel for Ibar]: The initial shareholder contract."

certain terms of the 1999 agreement pertaining to percentage of shares and voting power.[15] Under any of these scenarios, we conclude that the court properly directed a verdict for Stratek on the basis of Ibar's failure to present a prima facie case of breach of contract.[16]

It is undisputed that the signatories to the 1999 agreement were Ibar and Turullols, who represented himself and a group of investors. Stratek was not a party to the 1999 agreement. In fact, Stratek was not formed until 2002 so it could not have been a party to this agreement. Ibar relied, however, on a series of e-mail communications and faxes from Turullols, whom he referred to as the "managing director" of Stratek, as proof that Stratek agreed to be bound by the 1999 shareholder agreement. Contrary to Ibar's claim, this evidence did not establish that Stratek ratified the 1999 agreement. Nowhere in any of these documents did Turullols indicate that he was acting on behalf of Stratek. Although Ibar argued that Turullols sent these communications in his capacity as managing director of

---

[15] The memorandum of law states: "[Ibar] is not suggesting that the 1999 Shareholder Agreement applied to Stratek, but [Ibar] does contend that Stratek agreed to certain terms of the 1999 agreement, specifically, that it would continue to honor the provisions that provided for percentage of shares, voting power, and royalties, although royalties are not part of this case."

[16] The court noted the problems it was having trying to discern the exact nature of Ibar's claims, stating: "I believe that it is fair to say that this has been an atypical, and unusually confusing case. By the time the trial of the consolidated matters began on February 28, 2012, the parties appeared at trial with hundreds of exhibits and it was never entirely clear where [Ibar] was headed. On February 22, 2012, [Ibar's] counsel indicated to the court and opposing counsel that he would be pursuing an Implied Contract theory relying largely upon the 1999 Shareholder Agreement. Then, on March 7, 2012, [Ibar] filed 'An Amended Jury Instruction' stating he would pursue an express contract claim arguing that shares to Plastitech were to remain at 40.5 percent under the Agreement with Stratek. Then, in opposition to the Motion for Directed Verdict on March 12, 2012, [Ibar's] counsel argued that the claim is that [Ibar] was to have 40.5 percent of the shares in Stratek in his own name. Finally, on March 13, 2012, [Ibar's] counsel argued that the

Stratek, the letters are not on Stratek letterhead. Most of the letters are addressed to Ibar informally as "Apy" and are signed simply by "Jose Luis." Furthermore, although Ibar argued that Turullols was managing director of Stratek, and therefore had the authority to bind the company, he did not present evidence to support this argument.[17] Ibar did not call Turullols or any other individual from Stratek as a witness in this case, even though Turullols and Stall were present for the entire trial.

More problematic for Ibar, however, is the fact that most of these communications predated the formation of Stratek in 2002 and some even predated the formation of Plastitech in 1999. The only communication that Ibar offered that was written after the formation of Stratek was exhibit 14. According to Ibar, this document, which was prepared in 2006, reflected the evolution of shares in Plastitech from 1999 to 2001 and in Stratek from 2002 to 2006.[18] Ibar argued that this document established that Stratek agreed to be bound by the 1999 agreement. Contrary to Ibar's argument, however, this document was not evidence of a contract between Ibar and Stratek pursuant to which Ibar would individually retain shares in Stratek.

Assuming, arguendo, that these e-mails and faxes established that Turullols as managing director of Stratek agreed to the terms of the 1999 agreement, Ibar failed to present any evidence that Stratek ratified any

breach of contract occurred in November 2006, when the share of Plastitech fell below 39 percent level, in violation of the 1999 Shareholder Agreement."

[17] In Ibar's objection to Stratek's motion for directed verdict, he cited to two power point slides that referred to Turullols as managing director. The court noted, however, that these items were marked for identification only; they were not full exhibits.

[18] We note Ibar's contention that the court improperly found, as an undisputed fact, that he owned Plastitech, which owned shares in Stratek. As noted by the trial court, however, whether Ibar owned Plastitech was not dispositive of Stratek's motion for a directed verdict.

promises made by Turullols with regard to Ibar's ownership interest and control over Stratek. Stratek's articles of association are detailed and provide that the business of Stratek shall be managed by the board of directors. There is no indication in the articles that Stratek agreed to be bound by the 1999 agreement, nor is there any provision that gives a director the power to enter into contracts on behalf of the corporation. While these e-mails establish that Ibar and Turullols had discussions for several years regarding Ibar's interest in Plastitech and Stratek, they do not establish the existence of a contract between Ibar and Stratek. We conclude, therefore, that the trial court properly directed a verdict in favor of Stratek in this breach of contract action.[19]

The judgment is affirmed.

---

[19] In light of our conclusion that the court properly directed a verdict for Stratek on the basis of the failure to establish the existence of a contract, we need not consider the trial court's additional conclusion that the action was barred by the statute of limitations.